# COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present: Judges Huff, AtLee and Callins
Argued at Richmond, Virginia


DUANE COREY WASHINGTON

                                    MEMORANDUM OPINION[*] BY
v.       Record No. 0836-23-2         JUDGE DOMINIQUE A. CALLINS
                                       DECEMBER 10, 2024

COMMONWEALTH OF VIRGINIA


### FROM THE CIRCUIT COURT OF FLUVANNA COUNTY
David M. Barredo, Judge

Elliott M. Harding (Harding Counsel, PLLC, on briefs), for
appellant.

Brooke I. Hettig, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Duane Corey Washington was convicted, following a jury trial, for possession of a firearm

by a violent felon, in violation of Code § 18.2-308.2. On appeal, Washington argues that the trial

court erred when it admitted certain evidence and refused his proffered jury instructions and special

verdict form. Washington further argues that the evidence was insufficient to support his

conviction. For the following reasons, we disagree and affirm the conviction.

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

## BACKGROUND[1]

### I. The Search of Residence

In the early morning hours on September 10, 2021, law enforcement officials from various state agencies and the Drug Enforcement Agency (DEA) executed a search warrant at a residence in Fluvanna County. While Virginia state troopers cleared the home, occupants of the residence, including Washington, his wife, and his children, were detained outside. Once the home was deemed secure, Henrico County Task Force Officer Vaughan Livengood, who worked with the DEA, and DEA Agent Michael Lewis, searched the residence.

In the master bedroom, Officer Livengood discovered what appeared to be a rifle next to the bedstand. The weapon was a .9mm CZ Scorpion pistol. Agent Lewis noted that an optic, a magazine, and a light were recovered in the same area as the Scorpion. In the bedroom, officials also found a "Virginia Criminal Justice Agency Offender Information" form which contained a photograph of Washington, his social security number, and his date of birth. A Kroger prescription receipt for "Duane Washington" was in the bedroom as well.

In a closet within the residence, officers found a magazine loaded with ammunition, a gun box with a loaded magazine, and a second gun box containing an extended magazine. Officer Livengood photographed the ammunition and, when presented with the photographs at trial, attested to the photographs' accuracy.[2] Officer Livengood and Agent Lewis also discovered a Smith &

---

[1] On appeal, "we review the evidence in the 'light most favorable' to the Commonwealth." *Clanton v. Commonwealth*, 53 Va. App. 561, 564 (2009) (en banc) (quoting *Commonwealth v. Hudson*, 265 Va. 505, 514 (2003)). That principle requires us to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences that may be drawn therefrom." *Kelly v. Commonwealth*, 41 Va. App. 250, 254 (2003) (en banc) (quoting *Watkins v. Commonwealth*, 26 Va. App. 335, 348 (1998)).

[2] At trial, the Commonwealth moved to admit the images into evidence. Washington objected that the images were irrelevant and highly prejudicial as they depicted ammunition unrelated to the firearms at issue in the case. The trial court overruled his objection. On

Wesson pistol in the driver's side door compartment of a white pick-up truck parked in the driveway. Specifically, the Smith & Wesson was "in the bottom pocket of the driver side door" near where the driver's leg would have been.

While still on the scene, Albemarle County Police Detective Matt McCall interviewed Washington. After Washington waived his *Miranda*[3] rights, Washington admitted that the white pick-up truck in the driveway was his. Detective McCall told Washington about the "AR" rifle that had been found in the residence.[4] Washington stated, "[Y]eah, that's mine." Washington then identified the firearm as a .9mm Scorpion. When asked if he was a felon, Washington initially asserted that he was not, but, after discussing his criminal history with Detective McCall, Washington admitted that he was a felon.

On that same September day, Washington was charged with one count of knowingly and intentionally possessing or transporting a firearm after having been convicted a violent felon, under Code § 18.2-308.2.

## II. The Jury Trial

### A. *Chain of Custody*

At trial, Officer Livengood testified that once he photographed the evidence found during the search, he placed it into evidence bags and took the items to the DEA's Richmond office. Once in Richmond, DEA agents helped log and package the evidence. Upon arriving in Richmond, Agent Lewis identified the weapon located in the bedroom as a .9mm CZ Scorpion rifle with the

---

cross-examination, Officer Livengood admitted that he was not familiar with the Scorpion and acknowledged that one of the recovered magazines contained rifle rounds, not .9mm rounds.

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[4] Detective McCall stated, at trial, that he used the term "AR" because at the time of the interview he had not yet seen the recovered firearm and had been told it appeared to be an AR rifle.

serial number B954918. Agent Lewis explained that he referred to the Scorpion as a rifle because it was approximately 18 inches long and appeared to have a stock. Agent Lewis then identified the instrument found in the white pick-up truck as a Smith & Wesson pistol with the serial number FYZ0769.

Agent Lewis noted that the instruments were not fully submitted into the DEA's evidence system because they were not going to remain in the custody of that agency. Instead, the weapons were put into evidence bags with stickers that contained a number before being placed in a storage locker within the Richmond DEA office.

On October 13, 2021, Detective McCall collected items from DEA Agent Steve Scully near an exit on I-64. Detective McCall testified that the items he collected from Agent Scully were the same items that were recovered from the September 10, 2021 search. Objecting to the detective's testimony, Washington argued that Detective McCall lacked the personal knowledge to identify the instruments he collected from Agent Scully as the same instruments that the police seized in the search of the house on September 10, 2021.

On October 16, 2021, Detective McCall packaged the guns into boxes and sealed them. He then entered the evidence into the Albemarle County system database and printed a label which he placed on the outside of each box. Thereafter, he placed the items into the temporary evidence locker "with video recording on it." Detective McCall explained that evidence in the lockers may be retrieved only by police evidence personnel, who voucher it in the Albemarle County Police Department system and store it there. Detective McCall picked up the evidence from the Albemarle County Police for trial. On cross-examination, Detective McCall admitted that he did not note the serial numbers of the guns on September 10, 2021, nor did he testify to having received a chain of custody report from Agent Scully when he retrieved the items on October 13, 2021.

*B. Detective McCall's Testimony at Trial*

Detective McCall testified that he had been a law enforcement officer for 24 years and that during his time in law enforcement, he had "qualified" yearly, shooting pistols, rifles, and shotguns. Additionally, he was an avid hunter and was familiar with the operation of a firearm. Detective McCall retrieved the evidence boxes containing the seized evidence and identified his handwriting on the outside of the box containing the Scorpion. Detective McCall acknowledged that the Scorpion had been cleared and made safe for trial. The box identified its contents as a .9mm CZ Scorpion EVO[5] with the serial number B954918. Detective McCall explained that the Scorpion was a bolt action pistol. While he displayed the Scorpion for the jury, Detective McCall noted the different components of the gun and explained how a projectile would be expelled through it.

Detective McCall noted that a second weapon was recovered from Washington's white pick-up truck on September 10, 2021, that he had briefly seen it on the day of the search, and that he had also received that same instrument from Agent Scully. He identified the second gun as a Smith & Wesson semi-automatic pistol, model SD9VE with a serial number FYZ0768.[6] Detective McCall explained that the pistol was "designed to expel a projectile by means of an explosion." Based on his training and experience, he observed nothing on either the Scorpion or the Smith & Wesson that would alter the weapons' functionality.

Washington continuously objected to McCall's testimony, and when the Commonwealth attempted to display the Scorpion to the jury, Washington argued that there was no testimony that Detective McCall received the instrument back from the lab. The trial court overruled the objection noting that the instrument was "a non-fungible item, not easily altered or manipulated."

---

[5] The trial transcript misidentifies the weapon as a "CZ Scorpion EBO."

[6] Although Agent Lewis and Detective McCall testified to different serial numbers on the Smith &Wesson, Washington does not assign error arising from this specific inconsistency in their testimony. Therefore, we do not consider any issues on this point. *See* Rule 5A:20(c).

When the Commonwealth asked Detective McCall how the Scorpion and Smith & Wesson were designed to operate, Washington objected. Washington argued that Detective McCall could not testify about how the instruments were designed to operate because he had not been designated as an expert. He further asserted that Detective McCall was speculating whether the instruments could fire a projectile because there was no evidence that Detective McCall had fired either instrument. The trial court overruled the objections, noting that there was no need to prove that either instrument was operable "only that it's designed to do a certain function."

On cross-examination, Detective McCall acknowledged the discrepancy between the Scorpion's serial number and the serial number he transcribed onto a trace report he created for the gun and submitted to the DEA. Detective McCall explained that he simply made a typographical error when he wrote D954918 on the trace report instead of B954918. Detective McCall further acknowledged that he referred to the Scorpion as a rifle in his report but that the lab classified it as a pistol.[7] Detective McCall noted that he was familiar with Smith & Wesson pistols and had dismantled them before. The Scorpion, however, was unfamiliar to him and he had not dismantled one before. Finally, the detective admitted that he had not fired or dismantled either of the recovered instruments at issue. Neither the Scorpion nor the Smith & Wesson was admitted into evidence.

*C. Body-Worn Camera Footage*

Detective McCall also stated that he had asked Fluvanna County Sheriff's Deputy Patrick Reed, who had a body-worn camera, to accompany him so that his interview with Washington would be recorded. When asked if he had watched Deputy Reed's body worn-camera footage, Detective McCall averred that he had watched the pertinent parts. Detective McCall noted that

---

[7] Detective McCall also explained that the lab "considered [the weapon] a short barrel rifle."

- 6 -

there was "one portion" during his interview with Washington when the audio dropped but the video remained intact. Detective McCall testified that he "never made any statements, never told anybody to cut it off" and "ha[d] no idea what happened" to the audio during that period. Detective McCall could not remember Washington's exact statements during the audio gap but asserted that Washington was expressing his concern for his and his family's safety. Other than the audio gap, Detective McCall asserted that the footage fairly and accurately represented his conversation with Washington.

The Commonwealth moved to play the body-worn camera footage of Detective McCall's interview with Washington for the jury. Washington objected that the recording had not been authenticated as the original footage captured on the day of the interview. The trial court overruled the objection and the recording was played for the jury.

Deputy Reed testified that he was present with his body-worn camera when Detective McCall spoke with Washington. He explained that his body camera was on while he was at the scene and that when he returned to the precinct, he "dock[ed] the camera[,] . . . log[ged] it into the watchguard program . . . , and [the footage] upload[ed] automatically." He acknowledged that he did not "do anything" to "alter" the footage and confirmed that it was not possible to turn off just the audio and keep the visual recording. Deputy Reed admitted that he did not review the body camera footage in this instance because he did not write a report in this case.

D. *Motion to Strike and Defense's Evidence*

At the close of the Commonwealth's evidence, Washington moved to strike the charge. Washington asserted that the weapons only appeared to be firearms and the Commonwealth failed to prove that the instruments were designed to fire a projectile by means of an explosion. Further, Washington asserted that Detective McCall was unfamiliar with the .9mm CZ Scorpion and continuously called it a rifle instead of a pistol. Although Detective McCall was more familiar with

- 7 -

the Smith & Wesson, Washington asserted that the detective failed to ensure it could fire a projectile. Further, Washington noted that no certificate of analysis proved that the items could fire a projectile by means of an explosion.[8]

The trial court denied Washington's motion. The trial court observed that Washington admitted that the firearm recovered in the home was his as well as correctly identified that firearm as a .9mm Scorpion. The trial court also, among other things, noted Washington's "statement that he was concerned about his family's safety," finding "[t]hat's why he had the items in the house."

In his defense, Washington called Deputy Reed. Deputy Reed acknowledged that when he arrived on scene for the search, officers were still securing the home and it "appeared" several individuals were detained in the driveway. Although he testified that "the entire scene was not secure," he stated that "[t]he individuals that [he] observed were already detained." Deputy Reed could not recall if anyone other than law enforcement officers were allowed to leave the scene.

*E. Jury Instructions*

At the close of all the evidence, the parties discussed jury instructions with the court. Washington proffered a jury instruction defining a firearm which stated, "[e]vidence that demonstrates merely that an object appears to be a firearm or appears to have firing capability is not sufficient for a finding of guilt." The trial court struck the proposed instruction finding that the legal definition of a firearm for purposes of the charged offense was contained within the model instruction that the Commonwealth had provided. Washington then proposed instructions related to constructive possession as well as a special verdict form. The trial court rejected these proposed instructions and the special verdict form because they were likely to confuse the jury as requiring

---

[8] Washington also argued that the "[s]erial numbers were off" in Detective McCall's trace report for the CZ Scorpion.

the Commonwealth to prove specifically that Washington possessed one of the weapons that the police seized.

After deliberation, the jury convicted Washington of possession of a firearm by a convicted violent felon. The trial court sentenced him to five years of incarceration. Washington appeals.

ANALYSIS

I. Admissibility of Evidence

Washington contends that the trial court erred by admitting three different categories of evidence: photographs of ammunition found; Detective McCall's testimony that the two instruments were designed to expel a projectile; and Officer Reed's body-worn camera footage. Washington also asserts that the Commonwealth failed to establish a sufficient chain of custody for the CZ Scorpion or the Smith & Wesson.

"It is well-settled that '[d]ecisions regarding the admissibility of evidence lie within the trial court's sound discretion and will not be disturbed on appeal absent an abuse of discretion.'" *Nottingham v. Commonwealth*, 73 Va. App. 221, 231 (2021) (alteration in original) (internal quotation marks omitted) (quoting *Blankenship v. Commonwealth*, 69 Va. App. 692, 697 (2019)). "A court has abused its discretion if its decision was affected by an error of law or was one with which no reasonable jurist could agree." *Tomlin v. Commonwealth*, 74 Va. App. 392, 409 (2022).

*A. Photographs of Ammunition and Magazines*

Washington first argues that the trial court erred when it admitted photographs of ammunition and magazines that the police found in the home during the search. He presses that these photographs were irrelevant and unduly prejudicial because the ammunition could not be used with either the Scorpion or the Smith & Wesson. Washington claims that such prejudice

was not only "apparent on the face of the evidence" but was on full display when the trial court overruled Washington's motion to strike, when it "suggested that the presence of this unrelated ammunition somehow supported a finding that the Commonwealth had established that the items at issue were 'firearms.'"[9]

Unless otherwise prohibited, "[a]ll relevant evidence is admissible." Va. R. Evid. 2:402(a). "'Relevant evidence' means evidence having any tendency to make the existence of any fact in issue more probable or less probable than it would be without the evidence." Va. R. Evid. 2:401. "The scope of relevant evidence in Virginia is quite broad, as '[e]very fact, however remote or insignificant, that tends to establish the probability or improbability of a fact in issue is relevant.'" *Commonwealth v. Proffitt*, 292 Va. 626, 634 (2016) (alteration in original) (quoting *Virginia Elec. & Power Co. v. Dungee*, 258 Va. 235, 260 (1999)). "Photographs, when properly authenticated, are, as a general rule, held to be admissible under two distinct rules—(1) to illustrate the testimony of a witness, and (2) as 'mute,' 'silent,' or 'dumb' independent photographic witnesses[.]" *Ferguson v. Commonwealth*, 212 Va. 745, 746 (1972) (quoting 29 Am. Jur. 2d *Evidence* § 785).

The Commonwealth introduced the photographs of the ammunition and gun magazines during Officer Livengood's testimony about how the search was conducted and what the police discovered. Specifically, Officer Livengood testified that he was at the home with the DEA and that he was a member of the team that "began to search the residence [and] take photographs of

---

[9] Washington also asserts that the photographs were inadmissible as evidence tending to prove that he committed other bad acts for which he was not on trial. He did not raise this precise argument at trial as an objection to the photographs. *See* Rule 5A:18. Under Rule 5A:18, "a specific argument must be made to the trial court at the appropriate time, or the allegation of error will not be considered on appeal." *Edwards v. Commonwealth*, 41 Va. App. 752, 760 (2003) (en banc). Although there are exceptions to Rule 5A:18, Washington has not invoked them, and we do not do so sua sponte. *Spanos v. Taylor*, 76 Va. App. 810, 827-28 (2023). Accordingly, we do not consider this aspect of Washington's argument.

items in place," which he "recover[ed]" and "put . . . in an evidence bag." The Commonwealth then presented Officer Livengood with a series of photographs of items recovered during the search, including photographs whose admissibility Washington now challenges, Exhibits 10, 11, and 13. Exhibit 10 appeared to show "a magazine with ammunition inside." Officer Livengood testified that the photograph showed the apparent magazine "within a closet, next to a hat and other items." The other photograph exhibits included similar depictions, with Exhibit 11 appearing to show a pair of magazines and Exhibit 13 seeming to show a gun box containing a magazine. Thus, the photos were relevant and admissible to illustrate the officer's testimony. Accordingly, the trial court did not abuse its discretion in admitting the photographs into evidence.

### B. *Detective McCall's Testimony*

Washington argues that the trial court erred in overruling his objection to Detective McCall's testimony because Detective McCall's testimony was speculative, having "lack[ed] personal knowledge" of the firearms about which he testified. Washington notes that the officer had not dismantled or fired either of the weapons and admitted that he was unfamiliar with the CZ Scorpion and had never dismantled one. Washington argues that, relying "solely" on Detective McCall's "lay-opinion testimony," the Commonwealth "speculate[d] as to the nature of the items at issue based strictly on their appearance." In sum, Washington contends that the trial court should have excluded Detective McCall's general testimony that the weapons appeared to be designed to expel a projectile by means of an explosion because he had no knowledge regarding "the specific items at issue."

"Opinion testimony by a lay witness is admissible if it is *reasonably based upon the personal experience or observations of the witness* and will aid the trier of fact in understanding the witness' perceptions." Va. R. Evid. 2:701 (emphasis added). "The first prong of Rule 2:701

- 11 -

requires personal knowledge[;] . . . [t]he second prong of [the rule] speaks to the necessity of lay opinion testimony." *Harman v. Honeywell Int'l, Inc.*, 288 Va. 84, 98 (2014).

It is true that Detective McCall had not dismantled or fired either of the weapons at issue. Detective McCall also acknowledged that he was unfamiliar with the CZ Scorpion and had never dismantled one. But neither consideration bears on the issue Washington now raises: whether Detective McCall's testimony was *admissible*. Detective McCall's testimony qualified as valid lay opinion under Rule 2:701 based upon his personal experience and observations. Detective McCall had been a police officer for 24 years, had yearly training, shot different styles of firearms, and was an avid hunter. Further, Detective McCall was familiar with Smith & Wesson pistols and had experience disassembling them. Although Detective McCall was not familiar with the CZ Scorpion, he asserted that, given his experience, he could disassemble it.

Further, "[g]iven a general constitutional right to keep and bear them, firearms are generally not so exotic that it requires extensive or specialized expertise for a great many lay persons with familiarity with them to correctly identify a firearm as such." *Murray v. Commonwealth*, 71 Va. App. 449, 458 (2020). By testifying that the instruments were devices "designed to expel a projectile by means of an explosion," Detective McCall was merely testifying that in his experienced opinion, the instruments found were firearms. *See Jordan v. Commonwealth*, 286 Va. 153, 157 (2013) (defining a "firearm" for purposes of Code § 18.2-308.2 as "any instrument designed, made, and intended to fire or expel a projectile by means of an explosion" (quoting *Armstrong v. Commonwealth*, 263 Va. 573, 583 (2002))). Such testimony was an aid to the jury in understanding the officer's perceptions. Because Detective McCall's opinion was reasonably based upon his training, personal experience, and observations, the trial court did not err in admitting his testimony as a lay opinion under Rule 2:701.

### C. *Deputy Reed's Body-Worn Camera Footage*

Drawing on Virginia Rule of Evidence 2:901, Washington argues that, due to a "technical error that resulted in a material nine-second period of audio being silenced," and because "Detective McCall and former-Deputy Reed admitted that the video did not accurately reflect what the Commonwealth claimed it depicted," Deputy Reed's body-worn camera footage failed to be properly authenticated, and thus, was inadmissible. Washington contends his argument raises not "an issue of credibility for the finder of fact," but rather is an "attack" that "goes to the video's admissibility" since the footage failed to "capture the reality of the situation alleged."

"The admissibility of a videotape, like a photograph, rests within the sound discretion of the trial court." *Brooks v. Commonwealth*, 15 Va. App. 407, 410 (1992). "If the court determines that the information on the tape is relevant and that the probative value of its contents outweighs any prejudicial effect, it should be admitted." *Id.* But "[b]efore asking the court to admit a videotape into evidence . . . the party offering it must authenticate it and show that it is relevant." *Id.* That is, "[t]he requirement of authentication of identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the thing in question is what its proponent claims." Va. R. Evid. 2:901. Thus, "[t]he authentication inquiry is a narrow one and is only concerned with the genuineness of the offered evidence." *Canada v. Commonwealth*, 75 Va. App. 367, 377 n.4 (2022). "[A] finding that evidence is authentic says nothing about the weight the factfinder should attached to that evidence." *Id.*

At trial, Detective McCall testified that the body-worn camera footage fairly represented his interview with Washington. Detective McCall noted that there was a technical problem in that the audio was silent for nine seconds while Washington spoke. Detective McCall could not recall exactly what was said but noted that Washington was discussing his concern for his family's safety.

Notwithstanding the brief interruption in the audio of the recording, no more evidence was needed to "support a finding that the thing in question"—here, the video footage—was an accurate depiction of that interview and was what the "proponent claim[ed]" as required by Rule 2:901. *Cf. Church v. Commonwealth*, 71 Va. App. 107, 122-23 (2019) ("Once this threshold for proving admissibility has been met, any gaps in the evidence are relevant to the trier of fact's assessment of its weight rather than its admissibility."). Additionally, Deputy Reed testified that the footage accurately depicted what he observed on September 10, 2021. Deputy Reed's testimony further established that the body-worn camera footage was an accurate depiction of what occurred that morning.

Accordingly, the trial court did not abuse its discretion in concluding that there was an adequate foundation to admit the body-worn camera footage into evidence.[10]

### D. Chain of Custody of the Firearms

Washington asserts, among other things, that the chain of custody for the CZ Scorpion and the Smith & Wesson "was facially invalid because Detective McCall testified that he met" the relevant DEA agent, Agent Scully, "on the side of Interstate 64 to take possession of the

---

[10] Washington further argues that admission of the footage was prejudicial to him since he

> was denied his opportunity to advance the entirety of his statements [included in the missing section of audio], which contained mitigating or exculpatory evidence concerning the items at issue, and in the limited time that he is heard prior to the audio going silent, it is reasonable to believe that he may have been providing the merits of a necessity defense.

Washington posits, without evidence, that the missing audio could have "referenced the fact that his family members were the owners in possession of the items at issue. This argument not only lacks merit since the subject body-worn camera footage was admissible, it is incoherent on its own terms. That is, Washington's claim that the missing footage would have permitted for him to mount a necessity defense is at sharp cross-purposes with the argument that the footage should not have been introduced into evidence at all.

evidence on October 13, 2021, and brought it back to his office to log into evidence on October 16, 2021." Washington further probes that "McCall testified these items were in a box, though Agent Lewis . . . testified the DEA would not have kept the items in a box," and that McCall "did not actually see any of the alleged firearms at the scene on the day of the search," nor "did [he] record any identifying information concerning the items." Washington also argues that "[n]o evidentiary logs were presented in court" and that law enforcement officers on the scene, including Detective McCall, referred to the CZ Scorpion as a "rifle." Washington contends that "[b]ecause McCall did not see the items on the day of the search and the agents who collected them did not identify them in open court"—and because the Commonwealth did not call Agent Scully as a witness and the Commonwealth failed to furnish a certificate of analysis—there was "a material break in the vital links for the chain of custody and there was no way to corroborate that the items that McCall produced were the same as those recorded into evidence by Lewis or Livengood."

In sum, drawing on these and other arguments, Washington asserts the trial court abused its discretion when, finding that "firearms are . . . 'unlike other items' and are 'a non-fungible item, not easily altered or manipulated,'" it permitted the "physical presentation" of the weapons.

We review the trial court's determination regarding the adequacy of the chain of custody for abuse of discretion. *Pope v. Commonwealth*, 60 Va. App. 486, 511 (2012). "In proving the chain of custody, '[t]he Commonwealth must . . . account for every "vital link in the chain of possession."'" *Hargrove v. Commonwealth*, 53 Va. App. 545, 554 (2009) (alterations in original) (quoting *Alvarez v. Commonwealth*, 24 Va. App. 768, 777 (1997)). But "[a] court need not hear . . . from every witness who physically handled the samples for the [evidence] to be admissible." *Anderson v. Commonwealth*, 48 Va. App. 704, 717 (2006), *aff'd on other grounds*, 274 Va. 469 (2007). Rather, the Commonwealth "need only provide 'reasonable assurance' that

the evidence obtained by the police was the same evidence tested." *Id.* (quoting *Vinson v. Commonwealth*, 258 Va. 459, 469 (1999)). "[W]here there is mere speculation that contamination or tampering could have occurred, it is not an abuse of discretion to admit the evidence and let what doubt there may be go to the weight of the evidence." *Jeter v. Commonwealth*, 44 Va. App. 733, 739 (2005) (quoting *Reedy v. Commonwealth*, 9 Va. App. 386, 391 (1990)).

At the threshold, we observe that Washington's chain-of-custody argument is premised on a misunderstanding. Because neither firearm was admitted into evidence, questions regarding the chain of custody are not implicated. *Cf. Herndon v. Commonwealth*, 280 Va. 138, 143 (2010) ("When the Commonwealth seeks to introduce evidence regarding the chemical properties of an item, the burden is upon the Commonwealth to show with reasonable certainty that there has been no alteration or substitution of the item."); *Whaley v. Commonwealth*, 214 Va. 353, 356 (1973) (explaining that, under *Robinson v. Commonwealth*, 212 Va. 136 (1971), for "the results of a chemical or other technical analysis of an item" to be admitted into evidence, "it must be shown with reasonable certainty that there has been no alteration or substitution of the item," such that there is no "vital link in the chain of possession of the item" that is missing).

Accordingly, Washington has failed to show that the trial court's determination regarding the authenticity of the firearms constituted an abuse of discretion.[11]

---

[11] Washington also argues, erroneously, that "McCall testified to having a boxed Scorpion pistol with an alternative serial number than that recorded by Agents Lewis and Livengood" and that "McCall submitted" the Scorpion "for testing with a serial number of D954918." Agent Lewis testified that he "noted the serial number as B, as in Bravo, 954918." Detective McCall, while examining the box in which the Scorpion was kept, testified that written on the outside of the box was the weapon's caliber, .9mm, and its serial number, "Bravo 954918." And although, as noted, Detective McCall did note a "discrepancy" regarding the serial number included on a DEA *trace* form for the Scorpion, wherein the serial number was recorded with a "D" rather than a "B," the form was not for testing. Rather, Detective McCall stated that "the trace just basically shows us who purchased [firearms]. So the ATF typically deals with that with the straw . . . purchases."

## II. Sufficiency of the Evidence

Washington argues that the trial court erred when it denied his motion to strike the charge of possession of a firearm by a convicted felon. His challenge to the trial court's ruling necessarily "challenges whether the evidence is sufficient to submit the case to the jury." *Linnon v. Commonwealth*, 287 Va. 92, 98 (2014) (quoting *Lawlor v. Commonwealth*, 285 Va. 187, 223-24 (2013)). That is, his challenge raises the question of whether the evidence adduced sufficiently presented "a *prima facie* case [of possession of a firearm by a violent felon] for consideration by the" jury. *Vay v. Commonwealth*, 67 Va. App. 236, 249 (2017) (quoting *Hawkins v. Commonwealth*, 64 Va. App. 650, 657 (2015)).

"What the elements of the offense are is a question of law that we review de novo." *Linnon*, 287 Va. at 98 (quoting *Lawlor*, 285 Va. at 223-24). "Whether the evidence adduced is sufficient to prove each of those elements is a factual finding, which will not be set aside on appeal unless it is plainly wrong." *Id.* "In reviewing that factual finding, we consider the evidence in the light most favorable to the Commonwealth and give it the benefit of all reasonable inferences fairly deducible therefrom." *Id.* "After so viewing the evidence, the question is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* "In sum, if there is evidence to support the conviction, the reviewing court is not permitted to substitute its judgment, even if its view of the evidence might differ from the conclusions reached by the finder of fact at the trial." *Id.*

Washington does not challenge the Commonwealth's proof of his status as a felon. Instead, he argues that the Commonwealth only established that the instrument he possessed gave an outward appearance of a firearm. He asserts that the Commonwealth failed to submit a certificate of analysis from a laboratory that either the CZ Scorpion or the Smith & Wesson were examined or fired by a weapons technician. And according to Washington, Detective McCall's

lay, "speculat[ive]" testimony that the weapons recovered *appeared* to be designed, made, and intended to expel a projectile by means of an explosion was insufficient to prove they were firearms. "Detective McCall did not take any measures to determine if either object was a firearm," Washington argues, "and there was no testimony or other evidence . . . to show that the objects were anything more than instruments that looked like firearms."

"[T]o sustain a conviction for possessing a firearm in violation of Code § 18.2-308.2, the evidence need show only that [Washington] . . . possessed an instrument which was designed, made, and intended to expel a projectile by means of an explosion." *Armstrong*, 263 Va. at 584. "It is not necessary that the Commonwealth prove the instrument was 'operable,' 'capable' of being fired, or had the 'actual capacity to do serious harm.'" *Jones v. Commonwealth*, 277 Va. 171, 183 (2009) (quoting *Armstrong*, 263 Va. at 584). "Whether an object is a firearm . . . [is a] question[] of fact." *Barlow v. Commonwealth*, 61 Va. App. 668, 670 (2013).

Here, a reasonable factfinder could conclude beyond a reasonable doubt that the instruments recovered were designed to expel a projectile by means of an explosion. Officer Livengood and Agent Lewis testified that they found what appeared to be a rifle, but later learned to be a .9mm CZ Scorpion pistol, next to the bedside table in the master bedroom. In a closet, officers discovered two gun boxes each with a gun magazine and ammunition. In Washington's white truck outside the residence, officers found a Smith & Wesson pistol in the driver's door compartment. Most significant, when Detective McCall questioned Washington about the "AR" in the house, Washington admitted that the discovered "AR" was his and the weapon was a .9mm Scorpion.

Detective McCall testified that based on his training and experience both the CZ Scorpion and the Smith & Wesson appeared to be designed to expel a projectile by means of an explosion. Further, the jury viewed photographs of the items found and the firearms were displayed

to the jury. From these facts and circumstances, a reasonable factfinder could conclude that Washington possessed a weapon designed, made, and intended to expel a projectile by an explosion.

Nevertheless, Washington aligns the issue presented in this case with that addressed in one of our unpublished opinions, *Jamar Street v. Commonwealth*, No. 1537-10-2, 2011 Va. App. LEXIS 387 (Dec. 6, 2011). Washington argues that, in *Street*, this Court took the occasion to "reiterate[] that the Commonwealth cannot satisfy its burden to establish that an item is a 'firearm' for purposes of Code § 18.2-308.2 by appearance alone." In *Street*, appellant's conviction under Code § 18.2-308.2 hinged on the testimony of three witnesses. *Street*, slip op. at 4, 2011 Va. App. LEXIS 387, at *5-6. Two of the witnesses, restaurant employees, testified that the appellant pointed his gun "everywhere in the restaurant," while a detective, the third witness, stated "that the surveillance video showed a man entering the restaurant and 'pointing a black firearm in the direction of [the other two witnesses]." *Id.* But the detective, while testifying that "the gun was a '[b]lack semiautomatic pistol,'" admitted that "he was unable to tell whether it was 'a real gun.'" *Id.* (alteration in original).

We observed in *Street* that to secure a conviction under Code § 18.2-308.2, it is not sufficient for the instrument in question to merely "give[] the appearance of having a firing capability." *Id.*, slip op. at 3, 2011 Va. App. LEXIS 387, at *5 (quoting *Holloman v. Commonwealth*, 221 Va. 196, 198 (1980)). Instead, under Code § 18.2-308.2, a firearm "must be 'an instrument which was designed, made, and intended to expel a projectile by means of an explosion.'" *Id.*, slip op. at 4, 2011 Va. App. LEXIS 387, at *5 (quoting *Armstrong*, 263 Va. at 584).

In *Street* we also compared the facts with our published decision, *Redd v. Commonwealth*, 29 Va. App. 256 (1999), observing that, although "[t]he store clerk's description of the object brandished by Redd as 'a long black gun' [was] insufficient, *alone*, to prove that the

object possessed the 'ability to expel a projectile by the power of an explosion,'" "Redd's threat, upon presenting [a] weapon, to kill [a] clerk was an implied assertion that the object was a functioning weapon, being in fact the firearm that it appeared to be and possessing the power to kill." *Street*, slip op. at 5, 2011 Va. App. LEXIS 387, at *7-8 (first alteration in original) (emphasis added) (quoting *Redd*, 29 Va. App. at 259). We concluded that, unlike in *Redd*, the *mere* testimony provided by the three witnesses in *Street* was insufficient "to prove the existence of a firearm for purposes of Code § 18.2-308.2." *Id.*, slip op. at 5, 2011 Va. App. LEXIS 387, at *8.

Here, we have more than the mere testimony of witnesses who averred to have seen the appellant in possession of what *appeared* to be a gun. Detective McCall explained the firearms' design and how they were intended to work. More important, Washington admitted that the Scorpion was a firearm when he identified it as such, even clarifying its make. When Detective McCall noted that an "AR" had been found in the house, Washington responded, "Yeah, that's mine." And when the detective further queried as to the nature of the firearm, Washington acknowledged that it was "a Scorpion" and ".9mm." *Cf. Jordan*, 286 Va. at 158 (finding that a victim's "specific[] identifi[cation of] the object as a 'Raven,'" "a well-known, compact, .25 caliber semi-automatic pistol," "indicate[d] a specific weapon that was designed, made, and intended to fire or expel a projectile by means of an explosion"). Similarly, Washington expressed concern for the safety of his family in the body-worn camera footage captured by Deputy Reed's body camera, stating that his family had been threatened, providing further evidence to support the inference that the instrument recovered from the home was a firearm. *Cf. Redd*, 29 Va. App. at 259 (noting that appellant's "threat, upon presenting the weapon, to kill [a] clerk was an *implied assertion* that the object was a functioning weapon, being in fact the firearm that it appeared to be and possessing the power to kill," and that such "implied assertion, which

was corroborated by the appearance of the object and was uncontradicted by any other evidence, was evidence sufficient to support the trial court's finding that the object was a firearm" (emphasis added)).

Thus, in combination with the other evidence, the trier of fact could rely upon the implied assertion embedded in Washington's statements that the "AR" was his and that the object in question was a "Scorpion" and a ".9mm," in coming to the determination that the object at issue was a firearm.

Accordingly, the trial court did not err in denying Washington's motion to strike.

### III. Jury Instructions

At trial, Washington proffered three instructions and a special verdict form. Washington contends that the trial court erred when it failed to give his proffered jury instructions and when it failed "to provide a special verdict [form] to guarantee unanimity as to one or both of the firearms at issue."

"A reviewing court's responsibility in reviewing jury instructions is 'to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises.'" *Fahringer v. Commonwealth*, 70 Va. App. 208, 211 (2019) (quoting *Darnell v. Commonwealth*, 6 Va. App. 485, 488 (1988)). "Whether to give or deny jury instructions 'rest[s] in the sound discretion of the trial court.'" *Hilton v. Commonwealth*, 293 Va. 293, 302 (2017) (alteration in original) (quoting *Cooper v. Commonwealth*, 277 Va. 377, 381 (2009)). "[W]hether a jury instruction accurately states the relevant law is a question of law that we review de novo." *Watson v. Commonwealth*, 298 Va. 197, 207 (2019) (quoting *Payne v. Commonwealth*, 292 Va. 855, 869 (2016)).

Washington bears the burden to show that his proposed instructions were a "correct statement of the law, applicable to the facts of the case on trial, and expressed in appropriate

language." *Miller v. Commonwealth*, 64 Va. App. 527, 547 (2015) (quoting *Shaikh v. Johnson*, 276 Va. 537, 546 (2008)).  However, "[w]hen granted instructions fully and fairly cover a principle of law, a trial court does not abuse its discretion in refusing another instruction relating to the same legal principle." *Hilton*, 293 Va. at 302 (quoting *Daniels v. Commonwealth*, 275 Va. 460, 466 (2008)).

A. *Unanimity Instructions and Special Verdict Form*

Washington argues, without citing to legal authority,[12] that the "special verdict form is necessary in a fact-pattern such as this case, where two separate objects are found in two different portions of the property and the Commonwealth is proceeding on a theory of constructive possession."  The thrust of Washington's argument is that since the Commonwealth selected to "proceed on a theory of two different firearms for the factual predicate of an element of the offense, the court needed to provide a special verdict [form] to guarantee unanimity as to one or both of the firearms at issue."  The eventuality Washington contemplates his "special verdict" form and jury instructions were to foreclose was non-unanimity among jurors as to *which* of the proofs furnished by the Commonwealth were dispositive of a guilty finding.  Any such non-unanimity, Washington urges, offends "the Fifth and Sixth Amendments of the Constitution as well as Article I, § 8 of the Virginia Constitution."[13]

Washington's argument is unavailing.  Rule 5A:20(e) requires an opening brief to contain "[t]he standard of review and the argument (including principles of law and authorities) relating to each assignment of error."  "Unsupported assertions of error 'do not merit appellate

---

[12] Notably, Washington's argument is at odds with *Davison v. Commonwealth*, 298 Va. 177 (2019), which he neither cites, references, nor attempts to distinguish from the facts at bar.

[13] Washington advances no specific arguments as to how any of the aforementioned constitutional provisions would (or would not) apply in this case.

consideration.'" *Bartley v. Commonwealth*, 67 Va. App. 740, 744 (2017) (quoting *Jones v. Commonwealth*, 51 Va. App. 730, 734 (2008)).

> Simply put, "[i]t is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived."

*Blankenship v. Commonwealth*, 71 Va. App. 608, 623 n.2 (2020) (alteration in original) (quoting *Bartley*, 67 Va. App. at 746). Therefore, we find that Washington's failure to develop this argument in compliance with Rule 5A:20 is significant, and we treat this question as waived.

### B. Definition of a Firearm

Washington also argues that the trial court erred when it failed to give his proffered definition for a firearm and instead gave the Commonwealth's instruction. He argues that his instruction was an accurate statement of law and by failing to give it he was denied the opportunity to present his theory of the case.

Washington was charged with violating Code § 18.2-308.2(A), which makes it unlawful for "any person who has been convicted of a felony . . . to knowingly and intentionally possess or transport any firearm." The Supreme Court of Virginia has held that the term "firearm" under Code § 18.2-308.2 means "any instrument designed, made, and intended to fire or expel a projectile by means of an explosion." *Armstrong*, 263 Va. at 583. "It is not necessary that the Commonwealth prove the instrument was 'operable,' 'capable' of being fired, or had the 'actual capacity to do serious harm.'" *Id.* at 584.

The trial court granted Instruction 10, which accurately and fully stated the definition of a firearm for purposes of Code § 18.2-308.2. Instruction 10 provided:

> A firearm is an instrument designed, made, and intended to expel a projectile by means of an explosion. It is not necessary that the firearm be operable, capable of being fired, or have the actual capacity to do serious harm.

- 23 -

Washington's proposed firearm instruction mirrored Instruction 10 but included the following statement: "Evidence that demonstrates merely that an object appears to be a firearm or appears to have firing capability is not sufficient for a finding of guilt."

Washington cites no binding legal authority that the latter statement accurately reflects Virginia law on the definition of a firearm, citing, instead, to an unpublished case, *Jamar Street v. Commonwealth*. However, in *Street*, we explained that, whereas "firearm" for Code § 18.2-53.1 purposes refers to an instrument giving the appearance of a firearm, for Code § 18.2-308.2 purposes, "firearm" refers to a narrower class of objects, specifically, ones "designed, made, and intended to expel a projectile by means of an explosion." *Street*, slip op. at 3-4, 2011 Va. App. LEXIS 387, at *4-5. Hence, the sole authority Washington cites relies upon the *very* definition he challenges here.

What is more, Instruction 10 addresses the concern Washington raises regarding the "jury [having been] left to believe that an object can be a 'firearm' by merely appearing to be a firearm or appearing to hav[e] firing capability." Instruction 10 excluded the possibility Washington raises by defining firearm to be "an instrument designed, made, and intended *to expel a projectile by means of an explosion*." (Emphasis added). Thus, an object that merely *appears* to be a firearm, and in turn, was not designed, made, and intended to expel a projectile by means of an explosion, would not qualify as a firearm under the subject jury instruction. Accordingly, the jury, so instructed, was sufficiently inoculated against the "beli[ef] that an object can be a 'firearm' by merely appearing to be a firearm or appearing to hav[e] firing capability."

Because our responsibility is "to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises," *Fahringer*, 70 Va. App. at 211 (quoting *Darnell*, 6 Va. App. at 488), and Instruction 10 does this, we cannot find that the trial court abused its discretion in denying Washington's proffered definition of a firearm instruction.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court.

*Affirmed.*